Filed 2/2/23  P. v. Perez CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>ANNABELLE PEREZ,<br><br>        Defendant and Appellant. | F082400<br><br>(Super. Ct. No. 19CR-06497D)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Carol K. Ash and Steven K. Slocum, Judges.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Annabelle Perez (defendant) guilty of being an accessory after the fact to a murder committed by a codefendant.  The killing was alleged to be gang related for purposes of Penal Code section 186.22 (all undesignated statutory references are to

this code), but the jury rejected the allegation. However, gang allegations regarding defendant's conduct as an accessory were found true.

In her initial briefing, defendant claimed her motion to bifurcate the gang enhancement allegations in her joint trial with two codefendants was erroneously denied. In the alternative, she claimed the trial court abused its discretion by admitting certain gang evidence pertaining to the accused killer. In supplemental briefing filed after the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant relies on changes to section 186.22 and the creation of section 1109, which provides for bifurcation of gang enhancement allegations upon a defendant's request.

The People concede Assembly Bill 333's changes to section 186.22 necessitate reversal of the gang enhancement, but they argue no further relief is warranted. Defendant, arguing section 1109 applies retroactively, maintains the denial of her motion to bifurcate resulted in the admission of prejudicial gang evidence affecting the jury's verdict on the accessory charge. We agree the bifurcation ruling was erroneous and prejudicial. The judgment will therefore be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

### July 14, 2019

On July 14, 2019, at 11:31 p.m., a 911 caller reported hearing gunshots near Merced Avenue in the City of Merced. The caller lived on Rose Avenue, which intersects with Merced Avenue, but his residence was approximately 15 houses away from the intersection and he was unable to provide further information.

A second 911 caller, F.G., requested police assistance at the 1300 block of Merced Avenue. F.G. had also heard gunshots and could see "somebody laying down" in the street. When asked if there were any vehicles in the area, he told the dispatcher, "There's a white ca—it was a—it was a white Cadillac. It's—I don't know if it's—if this is the car." A few questions later, the dispatcher asked, "Is the white Cadillac still parked there?" F.G. replied, "No, he took off. He took off. He's long gone." The next question

2.

was, "Which way did the Cadillac go?" F.G. answered, "Going towards the Marriott out by the freeway by Motel Drive."

Police officers soon discovered the dead body of a 48-year-old man, Juan Ramirez (the victim). He was found lying on his stomach in the eastbound lane of Merced Avenue, near the address F.G. had provided to the dispatcher. An autopsy confirmed the victim sustained six bullet wounds, though one was characterized as a "graze wound." There was a front wound to the left shoulder and multiple posterior wounds, including one to the back of the head.

Investigators found 11 expended .40-caliber bullet casings and a bullet hole in a vehicle parked approximately 40 feet northwest of the victim's body, all in the vicinity of the 1400 block of Merced Avenue. It was determined the victim resided on the 1600 block of Merced Avenue, a considerable distance to the east of where he was evidently shot and killed. The police found no blood trails or droplets between the two locations.

*July 15, 2019*

In the early hours of July 15, 2019, a homicide detective interviewed F.G. and his friend, A.D. Another detective located video evidence captured by security cameras at the west end of Merced Avenue and along the northern stretch of Motel Drive. Later in the day, the police spoke to the victim's neighbors and executed a search warrant at the victim's home.

**F.G.'s Recorded Statements**

F.G. had been visiting A.D. on the night of the shooting. A.D. lived on Merced Avenue, approximately one block east of where the victim's body was found.

Late that evening, F.G. and A.D. had a strange encounter with an unidentified woman. F.G. described her as a "really skinny" Hispanic female with black hair and a tattoo on her left arm. She was approximately 19 or 20 years old, was sweating profusely, and appeared to be "on drugs." The woman had attempted to enter the house, and she seemed startled and/or frightened when F.G. opened the front door. She claimed

3.

to be looking for someone named "Jesse" before wandering off toward the 1300 block of Merced Avenue.

F.G. exited the house and saw the woman behaving in a suspicious manner outside of another residence. A.D. called the police, and officers came out to the neighborhood to investigate. The police departed after failing to locate the woman. Approximately 10 to 20 minutes later, F.G. and A.D. heard gunshots.

F.G. recalled hearing a man "arguing with somebody" immediately prior to the shooting. He and A.D. hurried outside after hearing the shots, looked to their right (west), and saw a white car in the westbound lane of Merced Avenue. Although F.G. had said it was a Cadillac during the 911 call, he told the detective it was a two-door Chrysler. After further questioning about the make, model, and year, F.G. said, "I had told the cops 2015. But [A.D.] was like, 'No that had to be like, older—2005.['] And he pulled up a picture and it looked exactly the same as the car."

When F.G. first saw the white vehicle, its brake lights were illuminated. The car remained stationary for approximately five seconds before slowly proceeding to a stop sign at the intersection of Merced Avenue and Motel Drive, then it "took off fast."

**A.D.'s Recorded Statements**

A.D.'s statements were generally consistent with those of F.G. regarding the events preceding the shooting. After hearing gunfire, A.D. and some of his relatives exited the house behind F.G. to see what had happened. Similar to F.G.'s account, A.D. remembered running outside, looking to his right, and seeing the brake lights of a car in the westbound lane of Merced Avenue. But whereas F.G. had indicated the vehicle was stopped close to the body, A.D. said the car was approximately "two houses down" from it, meaning west of the body, "[r]ight before Rose Avenue."

The details provided by A.D. further differed from F.G.'s account in two significant respects. First, A.D. was certain the white car had turned onto Rose Avenue,

4.

i.e., "[t]he street before the stop sign." In other words, the vehicle did not traverse Motel Drive. Second, A.D. was "pretty sure" it was a four-door Cadillac CTS.

The detective asked A.D. if he had shown F.G. "a picture of a car" (presumably referring to the one F.G. described as looking "exactly the same" as the suspect vehicle), and A.D. responded affirmatively. He then showed the detective the results of a Google images search he had performed on his phone for the term "2006 cadillac cts." All the images were of four-door vehicles. The detective informed A.D. that F.G. had said he thought it was a Chrysler. A.D. replied, "He didn't—he didn't really see. He was more payin' attention to the [dead] body."

### Security Camera Footage

A resident of the 1200 block of Merced Avenue had a video surveillance system with a camera mounted above his garage. The home was located between Rose Avenue and Almond Avenue (Rose to the east and Almond to the west), and the camera was pointed toward Merced Avenue. The grainy, low-resolution video feed showed cars passing by the house in the eastbound and westbound lanes of Merced Avenue. To a lesser extent, the feed also showed the headlights of vehicles traveling northwest and southeast on Motel Drive.

In reviewing the Merced Avenue video, the police saw a white- or light-colored two-door vehicle entering the neighborhood in the eastbound lane at approximately 11:22 p.m. A second white- or light-colored vehicle, which appeared to have four doors, passed by the camera in the eastbound lane at approximately 11:26 p.m. Next, at approximately 11:29 p.m., a car resembling the previously seen two-door vehicle passed by the camera in the westbound lane.[1]

---

[1]A 24-hour screen clock showed the cars passing by at 23:21:28, 23:25:38, and 23:28:42. However, according to the police testimony, the clock was approximately one minute slow. This was a rough estimate, as the officer's comparison of the video clock to his "department-issued iPhone" was only in relation to the hour and minutes, not the hour, minutes, and seconds. For the sake of readability, most subsequent time references concerning video evidence are stated in

Security cameras at nearby businesses captured video of a white two-door vehicle traveling northwest on Motel Drive, toward State Highway 140 (also known as Yosemite Parkway), at approximately 11:30 p.m. Earlier footage from those cameras showed a white two-door vehicle traveling southeast on Motel Drive, toward Merced Avenue, between approximately 11:21 and 11:22 p.m.

Collectively, the videos appeared to show that a white two-door vehicle had entered the victim's neighborhood from Motel Drive at 11:22 p.m. and departed from the neighborhood via Motel Drive between 11:29 and 11:30 p.m.

**Neighbors' Statements**

Witness M.A. was contacted by the police at approximately 7:00 a.m. the day after the shooting. M.A.'s bedroom faced the victim's backyard, and she recalled waking up sometime "after midnight" to the sound of voices from that area. The voices were described "as being two males and one female." One of the males spoke in English, but the other two conversed in Spanish, and the female had seemed "kind of mad." M.A. did not report hearing any gunshots. When asked about vehicles, M.A. claimed to have previously seen a white car parked outside of the victim's home.

Another neighbor, D.M., told the police she had seen the victim on July 14th "drinking beers with a light-skinned male and two female friends that were at his house." D.M. also claimed to have heard the victim "breaking bottles in the front yard" at approximately 10:00 p.m., i.e., 90 minutes prior to the shooting. A third neighbor, A.V., reported seeing the victim sometime between 5:00 p.m. and 7:00 p.m. on the day of the

a 12-hour format based on the approximations of the police witnesses. For example, video from a security camera at 11 West 15th Street in Merced captured footage of a moving vehicle at the purported date and time of "07/15/2019 13:59:22." But according to police testimony, the video clock was about "14 hours and 38 minutes ahead of time." We will simply describe what the video showed on July 14, 2019, at approximately 11:21 p.m., without further noting or explaining the discrepancy.

shooting.  According to this witness, the victim had appeared drunk and angry, "and was throwing cans of beer against the wall."[2]

### Search of the Victim's Home

Outside the victim's residence, along a walkway leading to the backyard, the police found the remnants of a food order from In-N-Out Burger.  These items consisted of an upside-down French fry tray or serving boat, scattered fries, and a ketchup packet. Several aluminum cans were strewn about the same area.

Also found outside was a laminated key tag, such as might be used by a car dealership or body shop to keep track of multiple sets of keys.  The preprinted strip of paper had blank spaces next to the words "Year," "Make," "Model," "Body" and "Color."  Someone had scrawled "CADDY" in handwritten letters across the entire tag.

Inside the victim's home the police found photographs of a man named Stuart Nagata, a piece of mail addressed to Nagata, and another document with his name on it. There was a receipt from a Big 5 sporting goods store dated July 1, 2019, for the purchase of a flashlight, golf balls, two pairs of shoes, and a $19 charge listed as "STD AMMO BCKGRND CK FEE."  A separate document indicated the same store had initiated a background check for defendant's sister, Karla Mariela Perez (Karla), within minutes of the transaction shown on the receipt.

Other items found inside the residence included a packaged component of a medical neck brace.  According to preliminary hearing testimony, there was also an eviction notice indicating the victim was being evicted.

---

[2]The information in this paragraph comes from police testimony at the preliminary hearing.  Witnesses D.M. and A.V. did not testify in court.  According to the lead detective on the case, A.V. further reported that "a white Dodge four-door vehicle came to the [victim's] house" on the day of the shooting.

*July 16, 2019*

By July 16, 2019, Nagata had become a suspect in the case. He was believed to own a 1999 Cadillac Eldorado, and the police had determined the license plate number. It was a two-door car with white paint. While conducting a "grid search" in the nearby town of Planada, the police located the vehicle at the residence of a man named Felix.

Undercover law enforcement agents surveilled Felix's residence for the remainder of the day. A maroon- or burgundy-colored Buick eventually pulled up to the house. A man later identified as Martin Olvera was seen exiting the Buick and, a few minutes later, relocating to the driver's seat of the Cadillac.

At approximately 8:45 p.m., Olvera departed from Felix's residence in the Cadillac. The Buick, which was then occupied by defendant and an unidentified female driver, followed behind Olvera as he proceeded to State Highway 140. The undercover agents tailed both vehicles for approximately 15 minutes before police officers in marked cars effectuated a stop in the City of Merced.

Driving due west on State Highway 140 is the most direct path between where the Cadillac and Buick started and ended their journey. However, the vehicles took what the People describe as a "serpentine" route by detouring north on Plainsburg Road, west on Bear Creek Drive, and south on Arboleda Road. The cars resumed westbound travel on State Highway 140 at roughly the midway point between Planada and Merced.

Defendant and Olvera were arrested during the traffic stop. Felix was arrested and interrogated the same evening. Over the course of two interviews (the second one was conducted two weeks later), Felix told multiple conflicting stories about Nagata and Karla arriving at his Planada residence sometime between the afternoon of July 14, 2019, and the afternoon of July 15, 2019. In one version of events, they had told Felix they were at a casino on the evening of July 14, i.e., the night of the shooting.

8.

A document found inside the Cadillac showed Nagata to be its registered owner as of July 12, 2019. His registered address was on East Alexander Avenue in the City of Merced.

*Further Investigation*

In late July, detectives obtained store surveillance video of the transaction documented on the Big 5 receipt found in the victim's home. The video showed Nagata, Karla, and a man named Fernando Luna shopping together on July 1, 2019. Portions of the video showed Nagata wearing a neck brace and being physically affectionate toward Karla. It also appeared to show him paying for the items listed on the receipt.

On July 29, 2019, Karla's then 17-year-old daughter, D.P., was hospitalized for alcohol intoxication and a stab wound sustained during an incident unrelated to this case. As the police had not yet located Nagata or Karla, detectives went to the hospital to question D.P. about the victim's death. D.P. was still intoxicated at the time of the interview, which lasted approximately three hours.

D.P. claimed to have killed the victim herself while under the influence of alcohol, cocaine, and marijuana. She referred to the victim by his first name, describing him as "a Mexican man that my mom was renting a room from." D.P. then added, "Her and her boyfriend were living there." She also remarked that her mother's boyfriend "wears a neck brace." Later in the interview, D.P. alleged that her mother, her aunt (defendant), and someone named "Martin" had all witnessed the victim's death.

Although D.P. claimed to have shot the victim, her story conflicted with some of the physical evidence. The major discrepancy was in her account of the victim being shot "in the face" while inside his home and then going "into the road asking for help." But she did accurately describe the interior and exterior of the victim's residence, and she knew the shooting "happened, like, around 11:30 [p.m.] almost 11:31."

On July 30, 2019, detectives obtained security camera footage from Casino Merced, located at 1459 Martin Luther King Jr. Way in the City of Merced. One video

9.

showed Nagata, Karla, defendant, and the victim in the casino on the night of the shooting. Nagata was wearing a neck brace. Exterior camera footage showed the group leaving together in defendant's Cadillac, with Karla behind the wheel, at approximately 11:10 p.m.

On July 31, 2019, detectives obtained surveillance video from a business located on West 15th Street, a few blocks east of Casino Merced. It showed a car resembling Nagata's Cadillac approaching the intersection of 15th and G Streets at approximately 11:21 p.m. on the night of the shooting. After pausing for traffic, the car turned left and proceeded northbound on G Street.

In early August, the police obtained surveillance video from an In-N-Out Burger located across the street from Casino Merced. It showed Nagata's Cadillac was in the drive-thru lane on the night of the shooting from approximately 11:11 p.m. to 11:18 p.m. The license plate was clearly visible in the footage.

The police eventually received information that Nagata was in Tulare County. On August 10, 2019, Nagata and Karla were arrested together in the City of Lindsay.

### Charges and Trial Proceedings

Nagata, Karla, Olvera, and defendant were jointly charged by information for their alleged involvement in the victim's death. Nagata and Karla were accused of premeditated murder (§§ 187, 189; count 1). Karla was also charged as an accessory after the fact, as were defendant and Olvera (§ 32; count 2). Nagata and Karla were further charged with attempted unlawful possession of ammunition (§§ 664, 30305; count 3). All counts included gang enhancement allegations pleaded pursuant to a former version of section 186.22, subdivision (b).

In January 2020, Nagata filed a motion under section 995 to set aside the information. Defendant joined in the motion. On February 18, 2020, the motion was granted as to the count 3 gang enhancement against Nagata but denied in all other respects.

10.

Nagata also filed motions to be tried separately from his codefendants and to bifurcate the trial of the gang enhancements. Defendant joined in those motions and filed separate points and authorities on her motion to sever. Defendant specifically complained of the "great disparity" in "prejudicial and inflammatory gang evidence against … Nagata" on the one hand, and the "little to no gang evidence against her" on the other. The trial court ordered severance of the case against Karla, but the motions were otherwise denied.

A jury trial commenced on February 25, 2020. On March 19, 2020, the trial court declared a mistrial due to the COVID-19 pandemic. Retrial began in September 2020 and continued into the following month. Renewed motions to bifurcate the gang enhancement allegations were denied. Nagata, Olvera, and defendant were jointly tried before a single jury.

### *Trial Evidence re: Counts 1 & 2*

A neighbor testified to seeing the victim outside his residence at approximately 10:30 p.m. on the night of the shooting. The victim was "throwing beer bottles or cans around" and yelling to someone inside the house "that he just wanted to go for a ride." He seemed "really upset." The witness did not know to whom he was speaking, but on prior occasions she had seen "two ladies and a gentleman that would usually let themselves into the home." The man wore a neck brace, and the trio had come and gone in a white Cadillac that "looked like an Eldorado."

Video evidence clearly showed Nagata, Karla, defendant, and the victim departing from Casino Merced in Nagata's Cadillac on the night of the shooting. The casino footage was edited to focus on the activity between 11:06 p.m. and 11:11 p.m. The evidence did not reveal when the group arrived at the casino, but a detective testified to Karla's cell phone data showing her phone was "in the area of Casino Merced" from

11.

11:00 p.m. to 11:19 p.m. The same witness testified that defendant's cell phone data showed her phone was "in the area of Casino Merced" from 9:53 p.m. to 11:30 p.m.[3]

The In-N-Out Burger videos showed the Cadillac in the drive-thru lane from approximately 11:11 p.m. to 11:18 p.m. According to the People's theory, the Cadillac then drove on West 15th Street, passing a security camera at 11:21 p.m. as it approached the G Street intersection. It proceeded northbound on G, then east on 16th Street, and eventually made its way to Motel Drive. Between 11:21 and 11:22 p.m., the Cadillac traveled southeast on Motel Drive and entered the victim's neighborhood in the eastbound lane of Merced Avenue.

The People's trial exhibit No. 114 was a video consisting of seven minutes and 40 seconds of footage captured by the security camera on the 1200 block of Merced Avenue. It depicted the activity there from approximately 11:22 p.m. until just prior to 11:30 p.m. (See fn. 1, *ante*.) The exhibit was a recording of the recording. The detective who authenticated it explained there was a problem converting the video files from the homeowner's security system to a viewable format. He improvised a solution: "I … used my department-issued iPod with the Axon Video Capture to actually record the monitor while I played the video [on the homeowner's equipment] so I could actually capture what was on screen." The detective stopped recording when the video clock hit 23:28:47, which he explained was approximately one minute behind the actual time.[4]

---

[3]The detective's exact testimony was as follows: "So T-Mobile provides the information in Coordinated Universal Time. So the time frame provided by T-Mobile is seven hours ahead of Pacific Standard Time. [¶] So … on the actual information provided by T-Mobile for July 15th, 2019, from 0453 hours through 0630 hours Coordinated Universal Time, which converts to July 14th, 2019, from 2153 hours to 2330 hours Pacific Standard Time, this particular device was in the area of Casino Merced." If the testimony was accurate, and assuming defendant had possession of her phone, this evidence conflicted with the People's theory that she was on Merced Avenue at the time of the shooting and witnessed the murder.

[4]The defense criticized the detective for failing to record the "three minutes" preceding the first 911 call. The three-minute estimate assumed the video clock was not approximately one minute slow. The detective conceded it was possible other cars had driven past the camera during the relevant time period. He also testified to having attempted to review the original

12.

Based on the Merced Avenue video and the In-N-Out Burger items found outside the victim's residence, the People argued Nagata, Karla, defendant, and the victim arrived back at the victim's home at approximately 11:22 p.m. The People theorized the victim had said or done something at the casino that made Nagata feel disrespected, which led to an argument at the house. Nagata was alleged to have shot the victim to death, but no theory was offered as to why the shooting occurred roughly two blocks away from the victim's home.

Witness M.A. was called to testify about waking up to the sound of people arguing on the night of the shooting. She was unsure of the time but again estimated it was "after midnight." She did not recall hearing any gunshots.

F.G. and A.D. both testified to having little memory of the incident. Their recorded interviews were played for the jury, as was F.G.'s 911 call. A police officer who had spoken to A.D. at the crime scene testified that he reported hearing someone say, prior to the shooting, "'Why are you mad?'" During the same conversation, A.D. claimed to have seen a 2005 or 2006 Cadillac CTS turn right onto Rose Avenue.

The 911 caller who lived on Rose Avenue, D.W., testified he was on his front porch when he heard the gunshots. He called 911 from inside his home approximately one minute later. The location of his garage obstructed his view such that he would not have seen a vehicle approaching from Merced Avenue before going into the house. There was also a period of approximately 45 to 60 seconds during which he would not have seen any vehicles that might have passed by his house. After calling 911 and returning to his porch, D.W. saw a police officer driving south on Rose Avenue toward Merced Avenue. He flagged down the officer and told him about the gunshots.

---

video again in preparation for the preliminary hearing, whereupon he discovered that it had been erased.

The People's theory was that Karla served as the getaway driver. Karla, Nagata, and defendant were alleged to have fled the scene in Nagata's Cadillac, passing multiple security cameras while heading northwest on Motel Drive at 11:30 p.m. However, the People's cell phone mapping expert testified the data for Karla's and defendant's phones showed both devices were one or two miles southwest of the crime scene at 11:30 p.m., "in the area of East Childs Avenue and Brantley Street." Upon further questioning, the witness explained the data was classified as having "a low confidence level," meaning the phones were more than 300 meters away from that location.[5]

Karla's daughter, D.P., testified pursuant to a grant of immunity after invoking her constitutional right against self-incrimination. She denied ever meeting the victim or discussing his murder with Karla or Nagata. D.P. also denied remembering what she had said during her hospital interview. A recording of the interview was played for the jury.

Through cross-examination of the lead detective, defense counsel suggested D.P. may have been the Hispanic female that F.G. and A.D. reported seeing prior to the shooting. The detective admitted to having considered this possibility, saying it was why he had asked D.P. what she wore that evening. During her interview, D.P. claimed to have been wearing pants and a black sweater. F.G. had described a person wearing shorts and a white tank top. The detective also testified that D.P.'s phone records "don't put her in that area" on July 14, 2019.[6]

Felix testified about the Cadillac being found at his home in Planada on Tuesday, July 16, 2019. Although he struggled with dates and times, the testimony indicated Karla and Nagata had shown up at his house on the night of the shooting (Sunday) or in the

_____

[5]It was never explained why defendant's cell phone data reportedly showed her device in two locations at the same time, i.e., "in the area of Casino Merced" and "in the area of East Childs Avenue and Brantley Street." (See fn. 3, *ante*.)

[6]The testimony regarding D.P.'s phone records was hearsay, but it was elicited by Nagata without any objections from the other parties.

14.

early hours of July 15, 2019 (Monday). In his words, "[T]hey just wanted a place to rest—to rest their head. And I said that they could stay in my room, as I was in my mom's room … with another friend of mine. And I was—I was busy, that I didn't have time to talk to them, you know, but that they could spend the night. [¶] They stayed the night. That was it." Felix admitted he was using methamphetamine on the dates in question.

Felix's testimony seemed to indicate Karla and Nagata had arrived alone, i.e., without defendant. There was no mention of defendant being there until Monday afternoon. Defendant's cell phone data reportedly showed her device was in Planada at 5:19 a.m. Monday morning. Felix referred to a lunch conversation from that day, during which plans were made for him, Nagata, Karla, and defendant to go to a casino. But then Olvera "happened to show up," and Felix "didn't want to go anymore because [he] did not want to be, like, a fifth wheel."[7] For reasons not explained, Felix let them borrow his car and the Cadillac was left at his house. He admitted to placing some type of covering over the Cadillac at Karla's request.

Karla and Nagata did not return to Felix's home. Felix did not see defendant or Olvera again until Tuesday, when they finally brought his vehicle back and took possession of the Cadillac. Defendant's cell phone data showed her device had traveled south on Monday night, registering with cell towers in Madera at 10:44 p.m. and in Tulare County at 11:59 p.m.

The People introduced an aerial map with a line depicting the route traveled by defendant and Olvera after they left Felix's house on Tuesday, immediately prior to their arrest. The prosecutor argued Olvera had intended to "dump" the Cadillac at an unknown

_____

[7]Felix's testimony about not wanting to be a "fifth wheel" was the only evidence suggestive of a romantic relationship between defendant and Olvera. The prosecutor's opening statement included an allegation that Olvera was her "significant other," and parts of the record indicate this was in fact true, but the nature of their relationship was not otherwise mentioned or proven at trial.

location and would have done so but for the intervention of law enforcement. The alleged role of the Buick, occupied by defendant and the unidentified driver, was to provide transportation for Olvera after he abandoned the Cadillac. Olvera's counsel argued this theory was speculative. Defendant's attorney made a similar argument: "[S]he was just in a car, riding in a car, behind … Olvera in the Cadillac. And as far as I know, there's no law against being a passenger in a car driving from Planada to Merced."

***Trial Evidence re: Gang Allegations***

Nagata was alleged to have killed the victim after being publicly disrespected by him at Casino Merced. The preliminary facts of a public dispute and Nagata feeling disrespected were alleged to be inferable from the Casino Merced videos. The victim had no known involvement with gangs, but Nagata was shown to be "a high-ranking Nuestra Familia criminal street gang member."

According to expert testimony, Nuestra Familia or "NF" is a criminal street gang with multiple levels of membership. Affiliates are commonly known as Northerners or Norteños, but those terms technically refer to a certain status or membership level. Nuestra Familia is both the name of the organization and the highest level of membership therein. The next level down is variously known as the "Northern Structure," "Nuestra Raza," and "Norteños Soldados" (abbreviated as "N-Sols"). Below that are the Norteños. As explained at trial, "Norteños are people that still are part of the cause or part of the Nuestra Familia, but they're lower level and haven't been selected or they haven't committed to being investigated [for advancement in the hierarchy]." Norteños may subdivide into smaller groups ("subsets") outside of the prison system, but "eventually it all leads up to Nuestra Familia."

Nuestra Familia's primary activities reportedly include murder, carjacking, witness intimidation, "major narcotic trafficking," and "[a]nything to do with violence." Murder, if committed against a gang rival, benefits NF by helping it maintain a reputation for violence and instilling fear and intimidation in others. The prosecution asked an

16.

expert witness if murdering someone not affiliated with gangs is also beneficial to NF. The expert replied, "Yes. If there was a reason for the homicide that they can articulate, then yes, it would benefit the gang as well." He then gave the example of an NF member reporting to his superiors that a victim "'totally disrespected me or disrespected the gang,'" in which case "that murder would be authorized." In other testimony, the expert noted the importance of respect in NF gang culture.

Two gang experts opined Nagata had attained the status of "Carnal" ("Brother") and was thus a "full-fledged member of the Nuestra Familia." According to one expert, "the NF has three categories of Carnals …[:] Cat-1, Cat-2, Cat-3." He opined Nagata was at least a "Cat-2 NF member," meaning he was involved in the overall management of the gang. The expert's opinions regarding Nagata's NF status were based on a recorded telephone conversation and photographs of him in the company of "Cat-3 NF members."[8] The phone conversation was played for the jurors and explained to them through the testimony of a special agent with the FBI.

The phone call had been intercepted during a wiretapping operation conducted in November 2017. It was a conversation between Nagata and a higher ranking NF member. They discussed large-scale trafficking of methamphetamine and heroin, including a purchase that would require "about a 100 G's." The conversation shifted to the topic of postponing or cancelling previously made plans to kill two women who had stolen money from the organization. Also discussed was an NF investigation of a lower level member for possible removal from the gang. It was said they would "hit him" if the findings were negative, which the expert testified meant some degree of physical assault and "could mean death."

---

[8]The People's briefing erroneously states the photographs were found inside the victim's home. The photos were located during a probation search at a different address in April 2018, nearly 15 months prior to the shooting. The jury was not told when or how the photographs were obtained.

17.

As further evidence of his gang membership, the People introduced photographs of Nagata's tattoos. The only tattoo directly related to NF was of the number 14, inked in large Roman numerals across his stomach and upper abdomen. According to expert testimony, references to this number are "predominant throughout the entire organization" because the 14th letter of the alphabet is N. The expert explained, "Anything that you can kind of put the, you know, emphasis on the N or the F could be used to represent the Nuestra Familia."

A tattoo of the word "murder" across Nagata's left forearm was deemed relevant because murder is one of Nuestra Familia's primary activities. This and several other tattoos were held admissible for the dual purpose of proving the gang enhancement allegations and showing "motive and identity of the shooter." Nagata's arguments for exclusion pursuant to Evidence Code section 352 were rejected.

The prosecutor repeatedly displayed and referenced a tattoo on Nagata's chest of someone holding a gun to the back of a man's head, just behind the right ear. When the gang expert was asked about it, he noted Nagata also had tattoos of dollar signs and the word "money," opining they were collectively "indicative of gang behavior" but did not specifically pertain to Nuestra Familia. During closing argument, the prosecutor asked the jury to "remember the tattoo on … Nagata's chest that depicts someone being shot in the back of the head, the exact same manner in which [the victim] was killed."

The jury also saw a tattoo on Nagata's right hand that said "get MAD," and another on his left hand that said "go BAD." A handgun was tattooed above the words on his left hand. One of the gang experts interpreted this as "indicating that when he gets mad, it'll go bad. So there's a propensity for violence if things go wrong." The trial court sustained an objection to this testimony and ordered it stricken, but the prosecutor was allowed to rephrase the question as follows: "So you're saying someone with a tattoo, based on your knowledge of criminal street gangs, like this would be signifying

that if they get mad, they go bad?" The witness answered, "Right. That—that's what that would indicate to me, that that person would."

Olvera's gang membership was proven by evidence of custodial statements made in May 2019, two months prior to the victim's death. A police officer testified Olvera "admitted to being an active Norteño gang member and also stated that he wanted to house in … an active Norteño block at the Merced County Jail." The jury saw a redacted portion of Olvera's recorded custodial interrogation following his arrest in this case, wherein he made implied admissions of active gang membership. The recording included references to a prior arrest in connection with a shooting. Another officer testified to personal knowledge of Olvera's affiliation with a Norteño subset called the Merced Ghetto Boys. The same witness testified Olvera had previously been arrested for possession of a firearm.

Photographs of Olvera's tattoos were admitted into evidence. One said "Merced," another was described as "the Aztec numeral 12," and a third tattoo depicted "someone pointing a gun." A gang expert testified the Aztec numeral was symbolic of the Merced Ghetto Boys, which has some type of connection to 12th Street in Merced.

Photographs of Karla's tattoos were admitted to show her allegiance to NF. The relevant images were described as "one dot and then the four dots." A gang expert explained, "Typically they're on separate hands, but those are separated enough that it's pretty clear it's one dot/four dots for 14 to represent the Nuestra Familia." The expert was then asked about the role of women in the gang. He answered, "Women actually, some of them—we don't validate the women, but—and none of them can be NF members—but they perform a vital role in a lot of the moving of the narcotics. They do a lot of the smuggling stuff into the prison. They're involved in holding a lot of the contraband if they're with another NF member in their purse or somewhere else."

The People did not introduce any gang evidence specific to defendant. Apart from being associated with Karla, Nagata, and Olvera, there was no indication defendant was

19.

involved with gangs or gang activity. The following hypothetical question was posed to the gang expert: "And so the woman who was in the back seat who was present for the argument and was later following the car that was used in the murder as they went through town, even if she is not a criminal street gang member, do her actions still benefit the criminal street gang?" The expert replied, "Yes. She don't have to—I mean, at some point you're going to have to become a member. There's always that first instance that makes you part of the gang. And this—that would be a good example of one that would. [¶] You're doing something to benefit the gang. Even if you had no prior history, that one act could be the thing that you are doing to benefit that gang."[9]

To establish a "pattern of criminal gang activity" (§ 186.22, former subd. (e)), the People relied on the prior convictions of two gang members, one of whom was Fernando Luna. The jury learned this was the same person seen on the Big 5 video shopping with Nagata and Karla on July 1, 2019. Luna was arrested on July 13, 2019, one day prior to the victim's murder, and later convicted of unlawful possession of a firearm. It was further revealed that Olvera was with Luna at the time of Luna's arrest. The second predicate offender was Sergio Uriostegui, who was previously convicted of assault with a semiautomatic firearm, unlawful possession of a firearm, and unlawful possession of ammunition.

***Verdicts and Sentencing***

The jury began deliberating on Thursday, October 8, 2020, at approximately 3:33 p.m. It recessed for the day at 4:44 p.m. Deliberations resumed on Friday, lasting from 10:00 a.m. to 4:00 p.m. There was an afternoon request for a readback of Felix's testimony and that of the neighbor who testified to seeing the victim outside of his house on the night of the shooting. At 3:48 p.m., the jury submitted the following question: "If

---

[9]Defendant's briefing argues this opinion contradicted the expert's prior testimony that women cannot be members of Nuestra Familia.

20.

… Nagata is not found guilty can [defendant] and … Olvera be found guilty of accessory after the fact?"**10**

The jury returned from a three-day weekend on Tuesday, October 13, 2020. Deliberations lasted from approximately 10:24 a.m. to 4:07 p.m. Late that afternoon, a request was submitted for "pictures of … Olvera's tattoos." On Wednesday, October 14, 2020, the jury deliberated for approximately 4.5 hours before returning its verdicts.

Nagata was found guilty of first degree murder, but the gang allegations against him were rejected as not true. Defendant and Olvera were both found guilty of being accessories after the fact. As to them, the gang enhancement allegations were found true. Defendant was sentenced to an aggregate prison term of three years four months (the lower term of 16 months for the crime plus two years for the gang enhancement).

## DISCUSSION

Section 186.22 provides for enhanced punishment of gang-related crimes. A gang-related felony is one "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 60.) The statute also requires "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

At the time of the underlying events, a criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and

---

**10**Counsel for defendant and Olvera had both stated, during closing argument, that a guilty verdict against Nagata on count 1 was a prerequisite to finding defendant or Olvera guilty as accessories after the fact. The trial court responded to the jury's question by referring to CALCRIM No. 440. The pattern instruction explained the elements of section 32 in terms of aid provided to "the perpetrator," which arguably implied defendant could still be liable as an accessory even if someone other than Nagata (e.g., Karla) had killed the victim.

21.

whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f), as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

A "pattern of criminal gang activity" was previously defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [offenses listed in paragraphs (1) to (33)], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons …." (Former § 186.22, subd. (e), 1st ¶, as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

In 2021, while this appeal was pending, the Legislature passed Assembly Bill 333, which took effect on January 1, 2022. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) The legislation amended section 186.22 in several ways:

> "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' [Citation.]" (*Tran*, *supra*, at p. 1206.)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*People v. Tran*, *supra*, 13 Cal.5th at p. 1206.)

Assembly Bill 333's amendments to section 186.22 apply retroactively to cases not yet final as of the legislation's effective date. (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.) The People thus concede defendant's gang enhancement must be reversed for insufficient proof of a pattern of criminal gang activity by Nuestra Familia, which needed to be shown to establish that it qualifies as a criminal street gang. We accept the concession, as the crimes committed by Fernando Luna and Sergio Uriostegui were not shown to have "commonly benefited a criminal street gang." (§ 186.22, subd. (e)(1).) "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

The People do not concede defendant's claim regarding bifurcation and section 1109. They argue section 1109 does not apply retroactively and, even if it does, defendant was not prejudiced by the denial of her motion to bifurcate. We address those issues below.

A.    **Retroactivity of Section 1109**

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id.* at pp. 742–745.) The rationale for this outcome is now known as the "*Estrada* rule." (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.) "When

new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.)

The *Estrada* rule has been applied "to statutes that merely made a reduced punishment *possible*." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629.) In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the inference of retroactivity was extended to legislation that "ameliorated the possible punishment for a class of persons." (*Id.* at p. 308.) In *Frahs*, a pretrial diversion statute (§ 1001.36) was held to apply retroactively because it "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.)

There is a split of authority on the retroactive application of section 1109. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565–568, [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Oct. 12, 2022, S275341, *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [same], review granted Dec. 14, 2022, S277103, and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.) The issue is currently pending before the California Supreme Court in the lead case of *Burgos*.

This district has held that section 1109 applies retroactively in nonfinal cases such as this one. We reach the same conclusion here for the reasons fully stated in *People v. Ramos*, *supra*, 77 Cal.App.5th 1116 and *People v. Montano* (2022) 80 Cal.App.5th 82. The following is a summary of the analyses in those opinions.

Section 1109 contains no express declaration of retroactivity. However, there is a statement of legislative findings in an uncodified section of Assembly Bill 333. (Stats. 2021, ch. 699, § 2.) "An uncodified section is part of the statutory law." (*Carter v.*

24.

*California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925.) We thus consider these legislative declarations:

> "According to the Committee on Revision of the Penal Code's 2020 report: [¶] … [¶] Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2, subd. (d)(6).)

> "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (Stats. 2021, ch. 699, § 2, subd. (e).)

> "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 699, § 2, subd. (f).)

In *Lara*, the California Supreme Court acknowledged "*Estrada* is not directly on point" if the statute in question "does not reduce the punishment for a crime." (*People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th at p. 303.) "But its rationale does apply" if the new legislation "reduces the possible punishment for a class of persons." (*Ibid.*) A possible reduction in the extent of punishment and the possibility of avoiding any punishment whatsoever are both "potentially ameliorative benefit[s]." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 631.)

Section 1109 is intended to "reduce [the] harmful and prejudicial impact" of gang evidence (Stats. 2021, ch. 699, § 2, subd. (f)) and ultimately prevent wrongful convictions and unfair plea bargains (*id.*, subds. (d)(6), (e)). The "increased possibility of acquittal … necessarily reduces possible punishment." (*People v. Burgos*, *supra*, 77 Cal.App.5th at p. 567, review granted.) Likewise, "[b]y reducing the pressure to accept longer sentences, [section 1109] will necessarily reduce the degree of punishment for

25.

many defendants charged with gang enhancements, even if they never have to invoke its prophylactic protections at trial." (*Ibid*.; see Stats. 2021, ch. 699, § 2, subd. (e).)

"[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*People v. Frahs*, *supra*, 9 Cal.5th at p. 634.) Because it "provides a possible benefit to a class of criminal defendants and the statute does not contain an express savings clause that limits the [procedures] to prospective-only application, the specific question before us boils down to whether the Legislature 'clearly signal[ed] its intent' to overcome the *Estrada* inference that section [1109] applies retroactively to all cases not yet final on appeal." (*Frahs*, at pp. 631–632.) The People fail to identify any such indicators in Assembly Bill 333 or its legislative history. For all these reasons, we conclude section 1109 applies retroactively to nonfinal judgments.

## B. Error and Prejudice

Defendant and her codefendants at trial all moved for bifurcation of the gang enhancement allegations. The motions were denied. In light of section 1109, those rulings were erroneous. We apply the "*Watson* test" (*People v. Watson* (1956) 46 Cal.2d 818) to determine whether the error was prejudicial. (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1208–1209.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) "The Supreme Court has emphasized

'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'" (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.) Conviction of a lesser included offense, or a mistrial due to a hung jury, is a more favorable result than being found guilty as charged. (*Id.* at pp. 520–521; see *People v. Walker* (2015) 237 Cal.App.4th 111, 118; *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 [reversal based on reasonable probability jury would have found appellant "committed not a first degree murder but a second degree murder"].)

Section 1109 does not bar the admission of gang evidence, and its cross-admissibility for other purposes may result in jurors learning of a defendant's gang associations despite bifurcation. (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1208 ["We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) "'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1022.)

"But, 'even where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 294.) "Such evidence should not be admitted if only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th 557, 653), or "where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905). "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal

disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

The People argue defendant could not have been prejudiced by the failure to bifurcate the gang allegations because the gang evidence was "highly relevant to issues of motive, intent and the shooter's identity," and therefore cross-admissible in a trial of the charged offenses. We rejected this argument in *People v. Nagata* (Jan. 31, 2023, F082198) (nonpub. opn.) (*Nagata*), where the section 1109 error was held prejudicial as to Nagata given the reasonable probability of a more favorable outcome on all charges but for the admission of the various gang evidence. We hereby incorporate the *Nagata* opinion by reference and take judicial notice of the record in that appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see, e.g., *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of the record in a related appeal on the court's own motion].)

Defendant's liability was closely tied to the question of Nagata's guilt on the charge of murder. "Under section 32, an accessory is one 'who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof ….'" (*People v. Nuckles* (2013) 56 Cal.4th 601, 606–607.) Nagata's conviction on the murder count was not an absolute prerequisite to finding defendant guilty as an accessory after the fact (§ 972), but the prosecution's theory was that Nagata killed the victim. Defendant argues, and we agree, the likelihood of a more favorable outcome for Nagata makes it reasonably probable, i.e., there is "'more than an *abstract possibility*'" (*People v. Soojian*, *supra*, 190 Cal.App.4th at p. 519), that defendant would have achieved a better result on count 2.

Defendant also argues she "was tarred with guilt by association." Despite the "strong preference for joint trials" (*People v. Kelly* (1986) 183 Cal.App.3d 1235, 1241)

reflected in section 1098, "in a joint trial of a multiple number of defendants a codefendant may suffer 'associational prejudice.'" (*Kelly*, at p. 1240.) "For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." (*Zafiro v. United States* (1993) 506 U.S. 534, 539.) As we explained in our *Nagata* opinion, the gang evidence most likely to have been excluded in a bifurcated trial on the substantive offenses tended to show the codefendants' propensity for gun violence. We agree with the "guilt by association" argument to the extent it is reasonably probable the most inflammatory evidence against Nagata and Olvera had a prejudicial effect on defendant vis-à-vis the accessory charge. (Cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43 [upholding trial court's denial of a motion for severance; "[T]his is not a situation in which a marginally involved defendant might have suffered prejudice from joinder with a codefendant who participated much more actively. Nor is this a situation in which a strong case against one defendant was joined with a weak case against a codefendant"].)

The evidence against defendant was not particularly strong. First, the People's own cell phone mapping expert gave testimony that helped to refute the prosecutor's theory of defendant's whereabouts at the time of the shooting and immediately thereafter. (See fns. 3 & 5, *ante*.) Second, as explained above, the evidence implied she was not with Karla and Nagata when they first arrived at Felix's house in Planada. Third, an accessory after the fact must provide ""overt or affirmative assistance"" to the perpetrator. (*People v. Partee* (2020) 8 Cal.5th 860, 868.) Although defendant's phone data permitted the inference she had traveled to Tulare County with Karla and Nagata after leaving Felix's house on Monday, there was no evidence she was their driver or otherwise facilitated their escape. The prosecutor's theory of liability was that defendant

helped Olvera attempt to "dump" the Cadillac on Tuesday, but she was merely a *passenger* in the car driving behind him at the time of his arrest.

The length of the jury's deliberations, as well as its questions and requests to review evidence, further demonstrates the closeness of this case. (See *People v. Cardenas*, *supra*, 31 Cal.3d at p. 907; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) For the reasons explained, it is reasonably probable defendant would have achieved a more favorable outcome but for the denial of her motion to bifurcate the trial of the gang enhancement allegations. She is therefore entitled to a new trial on both the accessory charge and the related gang enhancement.

## DISPOSITION

The judgment is reversed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.